# UNITED STATES DISTRICT COURT
## for the
### EASTERN DISTRICT OF WISCONSIN

In the Matter of the Seizure of
(Address or brief description of property or premises to be seized)

APPROXIMATELY $148.95 IN FUNDS AND
INVESTMENTS FROZEN AND MAINTAINED AT
BETTERMENT IN TRADITIONAL IRA ACCOUNT
NUMBER 268011249456066, HELD IN THE NAME
OF BRANDI ELLIS

Case Number: 25-868M(NJ)

## WARRANT TO SEIZE PROPERTY SUBJECT TO FORFEITURE

TO: **CHRISTOPHER MANGAN, a Special Agent with the Internal Revenue Service, Criminal Investigation, and any Authorized Officer of the United States**.

An application by a federal law enforcement officer or an attorney for the government requests that certain property be seized as being subject to forfeiture to the United States of America. The property is described as follows:

Approximately $148.95 in funds and investments frozen and maintained at Betterment in Traditional IRA account number 268011249456066, held in the name of Brandi Ellis

I find that the affidavit and any recorded testimony establish probable cause to seize the property.

**YOU ARE HEREBY COMMANDED** to search on or before ___March 21___, 2025
*(not to exceed 14 days)*

❏ in the daytime – 6:00 a.m. to 10:00 p.m. ☒ at any time in the day or night, as I find reasonable cause has been established.

Unless delayed notice is authorized below, you must also give a copy of the warrant and a receipt for the property taken to the person from whom, or from whose premises, the property was taken, or leave the copy and receipt at the place where the property was taken.

An officer present during the execution of the warrant must prepare, as required by law, an inventory of any property seized and the officer executing the warrant must promptly return this warrant and a copy of the inventory to United States Magistrate Judge Nancy Joseph.

❏ I find that immediate notification may have an adverse result listed in 18 U.S.C. §2705 (except for delay of trial), and authorize the officer executing this warrant to delay notice to the person, who, or whose property, will be searched or seized *(check the appropriate box)* ❏ for _____ days. *(not to exceed 30)*
❏ until, the facts justifying, the later specific date of _____

Date and time issued _March 7_, 2025; _1:36_ p.m.

_____
*Judge's signature*

City and state: _Milwaukee, Wisconsin_

THE HONORABLE NANCY JOSEPH
United States Magistrate Judge
*Name & Title of Judicial Officer*

## RETURN

| Date Warrant received | Date and time Warrant executed | Copy of warrant and receipt for items left with |
|---|---|---|
| | | |

*Inventory made in the presence of*

*Inventory of property seized pursuant to the Warrant*

## CERTIFICATION

I swear that this inventory is a true and detailed account of the property seized by me on the warrant.

_____

Subscribed, sworn to, and returned before me on this date.

_____      _____
U.S. Judge or Magistrate Judge                                    Date

# UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF WISCONSIN

In the Matter of the Seizure of
(Address or brief description of property or premises to be seized)

APPROXIMATELY $148.95 IN FUNDS AND
INVESTMENTS FROZEN AND MAINTAINED AT
BETTERMENT IN TRADITIONAL IRA ACCOUNT
NUMBER 268011249456066, HELD IN THE NAME
OF BRANDI ELLIS

Case Number: 25-868M(NJ)

## APPLICATION FOR A WARRANT
## TO SEIZE PROPERTY SUBJECT TO FORFEITURE

I, Christopher Mangan, being duly sworn depose and say:

I am a Special Agent with the Internal Revenue Service, Criminal Investigation, and have reason to believe that in the Eastern District of Wisconsin there is now certain property, namely, approximately $148.95 in funds and investments frozen and maintained at Betterment in Traditional IRA account number 268011249456066, held in the name of Brandi Ellis, that is civilly forfeitable under 18 U.S.C. §§ 981(a)(1)(A), 981(a)(1)(C) and 984, including cross-references to 18 U.S.C. §§ 1956(c)(7) and 1961(1), and criminally forfeitable under 18 U.S.C. §§ 982(a)(1) and 982(a)(2) in conjunction with 28 U.S.C. § 2461(c), as property that (1) constitutes or is derived from proceeds traceable to specified unlawful activity, namely, bank fraud in violation of 18 U.S.C. §1344; (2) constitutes or is derived from proceeds traceable to specified unlawful activity, namely, wire fraud in violation of 18 U.S.C. § 1343; and (3) was involved in or traceable to money laundering offenses in violation of 18 U.S.C. § 1956; and which property is therefore also subject to seizure for purposes of civil forfeiture under 18 U.S.C. § 981(b) and for purposes of criminal forfeiture under 18 U.S.C. § 982(b)(1) and 21 U.S.C. § 853(f).

The application is based on these facts:

    ✓ Continued on the attached sheet.
    ❑ Delayed notice of _____ days (give exact ending date if more than 30 days:_____ is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

Christopher
A. Mangan

Digitally signed by
Christopher A. Mangan
Date: 2025.03.05 18:07:05
-06'00'

Signature of Affiant
Christopher Mangan, IRS-CI

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by telephone and email.

3/7/2025 @ 1:37 p.m.
Date and time issued

at Milwaukee, Wisconsin
City and State

Nancy Joseph, U.S. Magistrate Judge
Name & Title of Judicial Officer

Signature of Judicial Officer

## AFFIDAVIT IN SUPPORT OF AN APPLICATION FOR A SEIZURE WARRANTS

I, Christopher Mangan, a Special Agent with Internal Revenue Service, Criminal Investigation, being duly sworn, depose and state as follows:

## INTRODUCTION AND PURPOSE OF AFFIDAVIT

1. I am a Special Agent with Internal Revenue Service-Criminal Investigation (IRS-CI) and have been so employed since May 2022. I am currently assigned to the Chicago Field Office, and I work in the Milwaukee, Wisconsin post of duty. My responsibilities as a Special Agent include the investigation of potential criminal violations of the Internal Revenue Code (Title 26, United States Code) as well as related Money Laundering Statutes (Title 18, United States Code), and Bank Secrecy Statutes (Title 31, United States Code). Throughout my employment, I have participated in the preparation and execution of multiple federal search and seizure warrants.

2. As part of my employment with IRS-CI, I received six months of training at the Federal Law Enforcement Training Center in Glynn County, Georgia. The training included wide-ranging instruction relating to criminal tax violations, as well as training on other federal criminal violations such as mail fraud, wire fraud, money laundering, bribery, conspiracy, and a number of other offenses which constitute specified unlawful activities under federal law.

3. This affidavit is made in support of my application for the issuance of seizure warrants for the funds located in the following bank and investment accounts, which are also listed on Attachment A:

   a. $10,628.34 in funds frozen and maintained at Associated Bank in Account 2916469469, held in the name of BRANDI ELLIS. This amount is based on a known balance as of August 23, 2024, and there is probable cause to believe this

balance continues to be accurate since being frozen on May 29, 2024 (hereafter, "**SUBJECT ACCOUNT 1**");

b. $25,622.62 in funds frozen and maintained at Associated Bank in Account 2918052347, held in the name of BRANDI ELLIS. This amount is based on a known balance as of September 19, 2024, and there is probable cause to believe this balance continues to be accurate since being frozen on May 29, 2024 (hereafter, "**SUBJECT ACCOUNT 2**");

c. $10,288.38 in funds frozen and maintained at Associated Bank in Account 2917600278, held in the name of BRANDI ELLIS. This amount is based on a known balance as of June 28, 2024, and there is probable cause to believe this balance continues to be accurate since being frozen on May 29, 2024 (hereafter, "**SUBJECT ACCOUNT 3**");

d. $7,275.63 in funds frozen and maintained at Associated Bank in Account 2917085272, held in the name of BRANDI ELLIS. This amount is based on a known balance as of August 27, 2024, and there is probable cause to believe this balance continues to be accurate since being frozen on May 29, 2024 (hereafter, "**SUBJECT ACCOUNT 4**");

e. $7,270.72 in funds frozen and maintained at Associated Bank in Account 2917443216, held in the name of BRANDI ELLIS. This amount is based on a known balance as of August 16, 2024, and there is probable cause to believe this balance continues to be accurate since being frozen on May 29, 2024 (hereafter, "**SUBJECT ACCOUNT 5**"). ;

f. $1,270.91 in funds frozen and maintained at Associated Bank in Account 2170077685, held in the name of BRANDI ELLIS. This amount is based on a known balance as of September 22, 2024, and there is probable cause to believe this balance continues to be accurate since being frozen on May 29, 2024 (hereafter, "**SUBJECT ACCOUNT 6**");

g. $1,209.82 in funds frozen and maintained at Associated Bank in Account 2917298529, held in the name of ELLIS EMPIRE LLC. This amount is based on a known balance as of September 30, 2024, and there is probable cause to believe this balance continues to be accurate since being frozen on May 29, 2024 (hereafter, "**SUBJECT ACCOUNT 7**");

h. $14,175.80 in funds frozen and maintained at Associated Bank in Account 2917765105, held in the name of ELLIS EMPIRE LLC. This amount is based on a known balance as of September 30, 2024, and there is probable cause to believe this balance continues to be accurate since being frozen on May 29, 2024 (hereafter, "**SUBJECT ACCOUNT 8**");

i. $7,595.91 in funds frozen and maintained at Associated Bank in Account 2171961622, held in the name of Kionna Ellis. This amount is based on a known balance as of May 31, 2024, and there is probable cause to believe this balance continues to be accurate since being frozen on May 29, 2024 (hereafter, "**SUBJECT ACCOUNT 9**");

j. $46,709.03 in funds and investments frozen and maintained at Betterment in Cash Reserve and Taxable Investing Account 268011246236305 held in the name of BRANDI ELLIS. This amount is based on a known balance as of July 24, 2024,

and there is probable cause to believe this balance continues to be accurate since being frozen on July 15, 2024 (hereafter, "**SUBJECT ACCOUNT 10**");

k.  $8,528.19 in funds and investments frozen and maintained at Betterment in Roth IRA Account 268011246236446 held in the name of BRANDI ELLIS. This amount is based on a known balance as of July 24, 2024, and there is probable cause to believe this balance continues to be accurate since being frozen on July 15, 2024 (hereafter, "**SUBJECT ACCOUNT 11**");

l.  $148.95 in funds and investments frozen and maintained at Betterment in Traditional IRA Account 268011249456066 held in the name of BRANDI ELLIS. This amount is based on a known balance as of July 24, 2024, and there is probable cause to believe this balance continues to be accurate since being frozen on July 15, 2024 (hereafter, "**SUBJECT ACCOUNT 12**");

m.  $7,980.68 in funds frozen and maintained at Educators Credit Union in Account 236121, held in the name of KITCHY JOHNSON. This amount is based on a known balance as of May 31, 2024, and there is probable cause to believe this balance continues to be accurate since being frozen on May 31, 2024 (hereafter, "**SUBJECT ACCOUNT 13**");

n.  $150.59 in funds frozen and maintained at Educators Credit Union in Account 452108, held in the name of LATASHA MOORE-BLACK. This amount is based on a known balance as of May 31, 2024, and there is probable cause to believe this balance continues to be accurate since being frozen on May 31, 2024 (hereafter, "**SUBJECT ACCOUNT 14**");

o. $6.63 in funds frozen maintained at Educators Credit Union in Account 646765, held in the name of M.I.H. CREATIONS. This amount is based on a known balance as of May 31, 2024, and there is probable cause to believe this balance continues to be accurate since being frozen on May 31, 2024 (hereafter, "**SUBJECT ACCOUNT 15**");

p. $1,852.48 in funds frozen and maintained at Educators Credit Union in Account 262851, held in the name of RAMON HERNANDEZ. This amount is based on a known balance as of May 31, 2024, and there is probable cause to believe this balance continues to be accurate since being frozen on May 31, 2024 (hereafter, "**SUBJECT ACCOUNT 16**");

q. $287.92 in funds frozen and maintained at Landmark Credit Union in Account 747410001, held in the name of BRANDON PORTER. This amount is based on a known balance as of September 10, 2024, and there is probable cause to believe this balance continues to be accurate since being frozen on July 23, 2024 (hereafter, "**SUBJECT ACCOUNT 17**");

r. $1,618.06 in funds frozen and maintained at Landmark Credit Union in Account 19622777263, held in the name of BRANDON PORTER. This amount is based on a known balance as of September 10, 2024, and there is probable cause to believe this balance continues to be accurate since being frozen on July 23, 2024 (hereafter, "**SUBJECT ACCOUNT 18**");

s. $820.50 in funds maintained at Educators Credit Union in Account 119038, held in the name of BRANDON PORTER. This amount is based on a known balance as of November 30, 2024 (hereafter, "**SUBJECT ACCOUNT 19**");

t. $120.44 in funds maintained at Wells Fargo in Account 8354819081, held in the name of KITCHY JOHNSON. This amount is based on a known balance as of November 7, 2024 (hereafter, "**SUBJECT ACCOUNT 20**");

u. $5,989.33 in funds frozen and maintained at Ally Bank in Account 2211517285, held in the name of BRANDI ELLIS. This amount is based on a known balance as of August 18, 2024, and there is probable cause to believe this balance continues to be accurate since being frozen on July 1, 2024 (hereafter, "**SUBJECT ACCOUNT 21**");

v. $2,566.85 in funds frozen and maintained at Ally Bank in Account 1109686269, held in the name of BRANDI ELLIS. This amount is based on a known balance as of August 18, 2024, and there is probable cause to believe this balance continues to be accurate since being frozen on July 1, 2024 (hereafter, "**SUBJECT ACCOUNT 22**");

w. $13,267.78 in funds frozen and maintained at Ally Bank in Account 2209686258, held in the name of BRANDI ELLIS. This amount is based on a known balance as of August 18, 2024, and there is probable cause to believe this balance continues to be accurate since being frozen on July 1, 2024 (hereafter, "**SUBJECT ACCOUNT 23**");

x. $764.06 in funds frozen and maintained at Ally Bank in Account 2216953279, held in the name of BRANDI ELLIS. This amount is based on a known balance as of August 18, 2024, and there is probable cause to believe this balance continues to be accurate since being frozen on July 1, 2024 (hereafter, "**SUBJECT ACCOUNT 24**");

y.  $31.34 in funds maintained at Discover Bank in Account 7029714750, held in the name of BRANDI ELLIS. This amount is based on a known balance as of June 30, 2024 (hereafter, "**SUBJECT ACCOUNT 25**");

z.  $50,651.17 in funds frozen and maintained at Educators Credit Union in Account 481885, held in the name of KITCHY JOHNSON and BRANDON PORTER. This amount is based on a known balance as of November 30, 2024, and there is probable cause to believe this balance continues to be accurate since being frozen on May 31, 2024  (hereafter, "**SUBJECT ACCOUNT 26**");

(hereafter, the "**SUBJECT ACCOUNTS**").

4.  Based on my training and experience and the facts as set forth in this affidavit, there is probable cause to believe that BRANDI ELLIS (herein referred to as "ELLIS") and others, have violated 18 U.S.C. §§ 1344 (Bank Fraud), 18 U.S.C. §1343 (Wire Fraud), and 1956 (Money Laundering) (the "Subject Offenses"). There is also probable cause to believe that the funds in the **SUBJECT ACCOUNTS** constituted or were derived from fraud proceeds and were involved in or traceable to money laundering offenses. All financial institutions involved except for Betterment, an investment platform, have deposits that are federally insured by the FDIC. Accordingly, there is probable cause to believe that the **SUBJECT ACCOUNTS** are:

a.  Subject to civil and criminal forfeiture under 18 U.S.C. §§ 981(a)(1)(C), 982(a)(2) and 984,  including cross-references to 1961(1), as property which constitutes or is derived from proceeds traceable to a violation of 18 U.S.C. §1344 (bank fraud);

b.  Subject to civil and criminal forfeiture under 18 U.S.C. §§ 981(a)(1)(C), 984, and 28 U.S.C. §2461, including cross-references to 18 U.S.C. §§ 1956(c)(7) and

1961(1), as property that constitutes or is derived from proceeds traceable to a violation of 18 U.S.C. § 1343;

c. Subject to civil and criminal forfeiture, under 18 U.S.C. §§ 981(a)(1)(A), 981(a)(1)(C), 982(a)(1), and 984 and, as funds involved in or traceable to money laundering offenses, committed in violation of 18 U.S.C. § 1956; and

d. Subject to seizure for purposes of civil forfeiture under 18 U.S.C. § 981(b) and for purposes of criminal forfeiture under 18 U.S.C. § 982(b)(1) and 21 U.S.C. § 853(f).

5. The information contained in this affidavit is based upon my own personal training, experience, and background as a Special Agent, my personal knowledge of the ongoing investigation, as well as information I have obtained from other law enforcement personnel with knowledge of this investigation, the victim, and records and information received from other parties, all of which I believe to be truthful and reliable. Because this affidavit is being submitted for the limited purpose of securing a seizure warrant, I have not included each and every fact known to me concerning this investigation. All dates are on or about the date specified. All amounts are approximate unless otherwise specified.

## FACTS SUPPORTING PROBABLE CAUSE

**I. Overview of the Investigation and Background of Catholic Charities of the Archdiocese of Milwaukee**

6. In May 2024, an investigation was initiated by the St. Francis Police Department located in St. Francis, Wisconsin in response to a reported fraud committed by an employee against Catholic Charities of the Archdiocese of Milwaukee (herein referred to as "CCMKE"), a Milwaukee area non-profit organization that provides social services to people living in poverty. This theft was reported to the St. Francis Police Department by the Chief Operating Officer (herein

referred to as "RC") of CCMKE. RC reported to St. Francis law enforcement that the Director of Finance at CCMKE, ELLIS, had issued unauthorized checks to herself and third parties on behalf of CCMKE and had engaged in fraudulent documentation of the financial records to avoid detection of her fraudulent scheme. RC notified law enforcement that an initial review by CCMKE into the fraudulent financial activity conducted by ELLIS revealed that ELLIS had engaged in the fraudulent scheme for several years and had stolen a significant amount of money.

7. In July 2024, Internal Revenue Service – Criminal Investigation (IRS-CI) initiated an investigation into the same alleged fraud scheme facilitated by ELLIS. Since the start of the investigation, ELLIS has been identified as the main perpetrator of the fraud scheme based on witness statements, financial statements, and CCMKE records. The investigation revealed that as part of ELLIS' normal course of duties, ELLIS had unlimited access to CCMKE financial accounts and the authority to issue checks on behalf of CCMKE. Though ELLIS was authorized to issue checks on behalf of CCMKE, she could do so only with the required approval of RC. ELLIS, however, misused her authority as Director of Finance to override CCMKE's vendor-check-approval processes, and thereby directed fraudulent checks to issue from CCMKE financial accounts to herself and other co-conspirators. ELLIS caused these fraudulent checks to issue, without RC's required approval, to non-existent vendors and for purported services that were never rendered.

8. To date, and through my investigation and review of financial records from the **SUBJECT ACCOUNTS** and CCMKE's Associated Bank account, I identified approximately 377 checks issued from CCMKE to ELLIS and other fraudulent vendors between August 2017 and August 2024. The fraudulent, unauthorized checks totaled approximately $1,300,000.00. Approximately 136 (or 36%) of these checks, totaling approximately $325,000 (or 25% of fraud

proceeds), were cashed at an Associated Bank location and not deposited to a bank account. The following table is a summary of the fraudulent checks ELLIS caused to be issued from CCMKE during the course of this scheme.

| Summary of Checks Paid from Catholic Charities of Milwaukee and Received by Fraud Scheme Vendors Between August 2017 and August 2024 | | |
| --- | --- | --- |
| Fraud Scheme Vendor/Check Payee | # of Checks | Sum of All Check Amounts ($) |
| Brandi Ellis/Brandi Ellis Petty Cash/Brandi Ellis GC | 62 | $ 285,934.87 |
| Brandon Porter/Brandon Porter dba Porter Networking | 40 | 153,129.83 |
| Jezlia Barajas | 49 | 142,824.00 |
| Kitchy Johnson | 83 | 267,138.43 |
| Latasha Moore/M.I.H. Creations | 34 | 131,245.21 |
| Natalie Easter | 70 | 158,070.00 |
| Ramon Hernandez | 39 | 179,365.71 |
| **Grand Total** | **377** | **$ 1,317,708.05** |

9.      Based on my training and experience, I am aware that offenders will often cash checks at the same bank a check was issued from because the funds can be immediately confirmed and available. Further, I am aware that offenders often prefer to transact in cash because it is anonymous, difficult to trace, and it allows them to reintegrate funds into the financial system while obscuring the source of the funds.

10.     Based on my training, experience, and knowledge of this investigation, I believe that ELLIS, using her position as the Director of Finance for CCMKE, created false bills to pay alleged vendors for services that were never rendered, falsified billing software records, created checks that concealed the true payees, and falsified the purpose of payments from CCMKE for services not rendered, all to conceal and disguise the nature, source, location, ownership, and control of the proceeds. Accordingly, ELLIS and others used the **SUBJECT ACCOUNTS** to legitimize the fraudulent payments and to convert the proceeds of the fraud scheme to cash, further disguising the nature, source, location, ownership, and control over these funds.

## II. Organizational Structure within the Finance and Accounting Department of CCMKE

11. According to the July 2016 and April 2018 organizational charts I was provided by CCMKE, ELLIS held the title, Accounting Manager, prior to becoming Director of Finance for CCMKE. As per the July 2016 organizational chart, ELLIS managed two employees in the accounting department, including JOHNSON. As per the April 2018 organizational chart, ELLIS managed just one employee in the accounting department, JOHNSON. In each of these organizational charts, the Director of Finance position hadn't yet existed. Instead, ELLIS reported to a Chief Operating Officer (CFO), who then reported to, RC. According to the Director of Human Resources and IT for CCMKE (herein referred to as "NB"), once the former CFO was no longer employed by CCMKE in or around January of 2019, ELLIS gained the responsibilities in overseeing the finance department.

12. According to the December 2023 CCMKE organizational chart I was provided by CCMKE, ELLIS was listed as the Director of Finance and carried the letters "CPA" after her name. Based on my training and experience, an individual employed in an accounting or financial department that carries the letters "CPA" after their name, indicates they represent themselves as a Certified Public Accountant. According to NB, ELLIS represented herself as a CPA on her email signature line. CCMKE even paid for ELLIS to take the CPA exam. However, in my review of publicly available CPA license lookup records, I was unable to locate any record of a licensed CPA named BRANDI ELLIS in Wisconsin or any state.

13. As the Director of Finance, ELLIS directed several roles/staff in her department including a lead accountant, a junior accountant, and a billing manager. In this position, RC was ELLIS' direct boss, and RC had supervisory authority over all other CCMKE's directors.

## III. Background Regarding the CCMKE Vendor Check Approval Process

14. Based on my interview with NB, CCMKE did not have a written policy for hiring a new vendor. When CCMKE considered hiring a new vendor, the director overseeing the respective CCMKE program was responsible for vetting and obtaining a bid or a quote from the prospective vendor, along with typically one or two other vendors for comparison. After obtaining the bids, RC selected the vendor to be hired. ELLIS was not authorized to hire vendors without RC's determination and approval.

15. NB explained to me that for a check to be paid to a legitimate vendor of CCMKE, the following steps must take place, in chronological order:

a. An invoice or receipt is received from the vendor. When an invoice or quote is over $5,000.00, RC's pre-approval is required before the goods and/or services are contracted.

b. In Excel, an electronic check request is created containing the invoice date, vendor address, vendor name, information about the expenses, and the amount for each expense. The bottom of the check request contains the sum of the itemized expenses.

c. The check request is printed and signed by the manager of the person requesting the check. If NB or another director is requesting a check, the check request must go to RC's attention.

d. Once the check request is signed, it is attached to the invoice, and it's given to the accounts payable staff member.

e. The accounts payable staff member consolidates all check requests and provides them to ELLIS.

f. ELLIS prints checks that will be paid out and provides them to the lead accountant. ELLIS usually does this on Tuesday or Wednesday in the office.

g. The lead accountant inputs printed checks into Positive Pay. This entails entering the check date, check amount and check number on the bank's website. NB explained to me that Positive Pay is a preapproval process used by banks that will only allow a check to clear if it was inputted into Positive Pay. As a result, every CCMKE vendor check had to be inputted in Positive Pay.

h. The lead accountant returned checks inputted in Positive Pay to ELLIS. ELLIS used a physical signature stamp containing RC's signature to stamp RC's signature on to the signature line of check faces. The signature stamps were stored in ELLIS' office and would rarely be used by the lead accountant. The lead accountant would only use a stamper if ELLIS was out of the office on a planned vacation. Using RC's signature stamp was a long-standing process.

i. ELLIS returned stamped checks to the accounts payable staff member to be entered in QuickBooks.

j. The accounts payable staff member provided all stamped checks with the corresponding check requests and invoices to RC once a week.

k. RC reviewed the check and check stub for correctness and accuracy, including dollar amounts. RC would usually jot a tick mark on the check stub once RC reviewed it.

l. After RC's review of the check and check stub, RC returned the checks to the accounts payable staff member, who mailed them to vendors.

16. As part of my investigation, I reviewed the police report from the St. Francis Police Department written by Detective Holly McManus summarizing her investigation into this matter. In her report, Detective McManus detailed that RC believed fraudulent checks had been entered into Positive Pay but removed from the stack of checks ELLIS provided to RC for review. RC also noted his belief that ELLIS issued unauthorized checks because legitimate checks paid to vendors were always mailed, and some of the fraudulent checks included only a name and no address, and were often cashed on the same day they were issued, which would be impossible if they were mailed. Further, NB stated that RC expressed some of the fraudulent check stubs seemed doctored with RC's tick marks, and ELLIS knew that RC used a tick mark when reviewing checks.

## IV. Identification of Fraudulent Vendors Receiving Fraudulent Checks from CCMKE

17. After identifying the potential fraud, RC and NB conducted a review of CCMKE's financial records. They identified the following individuals and "vendors" as being unauthorized vendors who did not perform services to CCMKE. RC reviewed checks issued to these individuals and entities and determined that the checks that were issued contained his signature stamp without his approval:

   a. NATALIE EASTER (EASTER);

   b. JEZLIA BARAJAS (JEZLIA);

   c. RAMON HERNANDEZ (RAMON);

   d. BRANDON PORTER (PORTER) & PORTER NETWORKING;

   e. M.I.H. CREATIONS / LATASHA MOORE-BLACK (MOORE);

   f. KITCHY JOHNSON (JOHNSON); and

   g. BRANDI ELLIS.

## V. Fraudulent CCMKE Checks Written to EASTER for Cash

18. Based on my interview with NB, EASTER was not an authorized payee of CCMKE. Records I reviewed from the CCMKE QuickBooks indicated that approximately 70 checks totaling approximately $158,070.00 were inputted in the CCMKE QuickBooks and were also made payable to EASTER between January 2023 and May 2024. Approximately 52 of the 70 checks paid to EASTER were entered or last modified by the QuickBooks user, Msimonis. NB stated that Msimonis was a CCMKE employee between October 2015 and September 2017, but not during the time that these checks were entered in QuickBooks. NB explained ELLIS was an administrative user in CCMKE's QuickBooks and was responsible for removing users from the QuickBooks once they were no longer employed by CCMKE. It is, therefore, possible that ELLIS used the Msimonis account to enter these checks, and I believe it is likely she misused the Msimonis account.

19. Approximately 25 of 70 checks written to EASTER were entered to the QuickBooks billing account "60100 – Salaries and Wages." According to NB, these were unauthorized checks because EASTER was never an employee of CCMKE. NB and I also reviewed CCMKE check #206418 that was paid to EASTER, and the bill associated with this check that was entered in the QuickBooks. The bill contained the memo "Translation Services" and was classified as "Behavioral Health: BH MAO" in the CCMKE QuickBooks. NB stated that CCMKE only provides behavioral health services if they have a therapist that can speak English or Spanish, and CCMKE has bilingual therapists on payroll. Therefore, NB stated that CCMKE would not issue a check to pay for translation services.

20. All 70 checks written to EASTER from CCMKE totaling approximately $158,700.00 were cashed at various Associated Bank locations, the same bank that CCMKE issues checks from. I observed that most of the checks were stamped by Associated Bank on the same

day they were written, or the next day. Based on my training and experience, a bank will stamp the back of a personal check to indicate that it has been cashed or deposited with that bank. In this case, EASTER did not maintain a deposit account with Associated Bank, and the checks were cashed. I also observed that all the checks did not have an address on the payee line. There is probable cause to believe that all of the checks issued to EASTER were fraudulent.

21.     Based on my training and experience, the conversion of illicit proceeds to cash is an indicative attempt to conceal the origin of illicit proceeds.

## VI.     Fraudulent CCMKE Checks Written to JEZLIA for Cash or for Deposit to SUBJECT ACCOUNT 16 held at Educators Credit Union in the name of RAMON

22.     Based on my interview with NB, JEZLIA was a CCMKE employee between January 2018 and June 2018, hired specifically for this six-month period to help with accounting. According to NB, payments issued to JEZLIA after June 2018 would not have been authorized.

23.     According to records obtained from the CCMKE QuickBooks and Associated Bank, approximately 50 checks totaling approximately $145,952.00 were written to JEZLIA between August 2017 and August 2024, with the first check being written on or around August 2, 2017, and the most recent on or around April 30, 2024. Since JEZLA's employment was terminated with CCMKE in June 2018, JEZLIA received approximately 32 checks totaling approximately $97,895.00. Approximately 81% of these checks (approximately $81,611.00) were cashed at an Associated Bank location while the remaining 19% (approximately $18,884.00) were deposited to **SUBJECT ACCOUNT 16** held at Educators Credit Union in the name of fraudulent vendor, RAMON.

24.     According to NB, CCMKE did not employ RAMON as a vendor at any time. Indeed, RAMON is unknown to CCMKE. Moreover, there is reason to believe that RAMON is

associated with JEZLIA because NB's review of the CCMKE credit card statements revealed unauthorized charges showing RAMON and JEZLIA traveling to Disneyland using CCMKE's funds.

25. Many of the bills associated with JEZLIA entered into CCMKE's QuickBooks included an address of 1824 W Hopkins, Milwaukee, WI 53204. I could find no record of this address. In fact, this address would belong to Union Cemetery in Milwaukee, WI. The use of this address by ELLIS in CCMKE's QuickBooks further demonstrates that the bills and checks issued to JEZLIA were fraudulent.

26. Approximately five checks were written to JEZLIA and entered to the CCMKE QuickBooks to billing account "66400 – Janitorial Services" between 2019 and 2022 totaling approximately $15,025.00. NB stated that JEZLIA did not provide janitorial services, that the archdiocese building staff is responsible for cleaning the CCMKE space, and that payment to JEZLIA for janitorial services would not have been authorized.

27. Other checks issued to JEZLIA were associated with QuickBooks classification "Child Welfare MAO." Even when she was employed at CCMKE, JEZLIA was not involved in the child welfare program. Additionally, CCMKE does not provide language services as part of the child welfare program and NB has never heard of CCMKE using a translator in this program.

28. Approximately 11 checks totaling approximately $33,256.00 were written from CCMKE to JEZLIA between 2023 and 2024 containing the memo "Translation Services." Because CCMKE does not pay for translation services, these checks were issued fraudulently, without authorization.

29. Since the termination of JEZLIA's employment with CCMKE in June 2018, approximately 19 of 32 checks written to JEZLIA were entered or last modified by CCMKE QuickBooks user, Msimonis, who was not employed by CCMKE during this time.

30. Based on my review of checks issued to JEZLIA and the attendant QuickBooks records, as well as statements from CCMKE staff, there is probable cause to believe the payments issued to JEZLIA since June 2018 are fraudulent.

## VII. Fraudulent CCMKE Checks Written to RAMON and Deposited to SUBJECT ACCOUNT 16 held at Educators Credit Union in the name of RAMON

31. I reviewed with NB, checks #206222 and #206973, written from CCMKE and paid to RAMON, as well as the bills associated with these checks. These checks, like 25 of 39 checks, totaling $125,330.00, made payable to RAMON, were entered to the QuickBooks billing account, "66400 – Janitorial Services." RAMON did not provide janitorial services to CCMKE.

32. Based on my review of the Associated Bank records, approximately 39 checks were written from CCMKE's bank account and paid to RAMON between August 2017 and August 2024, totaling approximately $179,365.71. 100% of these checks were deposited to **SUBJECT ACCOUNT 16** held at Educators Credit Union in the name of RAMON – the same account that JEZLIA utilized to deposit fraudulent checks written from CCMKE to her.

33. From my review of the CCMKE QuickBooks, approximately 12 of 39 checks issued to RAMON were entered within the CCMKE QuickBooks as issued to vendors other than RAMON – concealing the true payee of the check. Associated Bank records indicate that these 12 checks were issued, and deposited, to accounts controlled by RAMON. Additionally, approximately three of these 12 checks were entered or last modified to QuickBooks by user, BELLIS, while the remaining nine were entered or last modified by user, Msimonis, who was no

longer employed by CCMKE. QuickBooks user, Msimonis, was the user of record that entered or last modified approximately 26 of 39 checks paid to RAMON. Based on my training and experience, the use of this terminated employee user account is an attempt to conceal the actual user accounting for fraudulent checks inside the CCMKE financial record keeping system.

**VIII.** **Fraudulent CCMKE Checks Written to PORTER and PORTER NETWORKING and Deposited to SUBJECT ACCOUNT 17, SUBJECT ACCOUNT 18, and SUBJECT ACCOUNT 19 held at Landmark Credit Union and Educators Credit Union in the name of PORTER**

34. Based on my interview with NB, PORTER is an individual completely unknown to CCMKE, and PORTER DBA PORTER NETWORKING is a fraudulent vendor that did not perform services for CCMKE and was never authorized to receive payment from CCMKE. NB located a $16,000.00 invoice from PORTER NETWORKING for services and equipment occurring on or around January 4, 2018, relating to a Cisco server and kit with remote. As the Director of IT for CCMKE, NB has maintained full control and oversight over CCMKE's IT since 2019, NB would know whether PORTER provided IT-related services to CCMKE. It did not.

35. On many of the bills inputted to the CCMKE QuickBooks for PORTER NETWORKING, an address of 4189 N Hampton Blvd., Milwaukee, WI 53209, was inputted. I could find no record of this address existing. Based on my training and experience, I believe the use of this address in the CCMKE QuickBooks by ELLIS further establishes PORTER and PORTER NETWORKING as a fraudulent vendor that was not authorized to receive checks from CCMKE.

36. I reviewed with NB, CCMKE checks #206682 and #206980 totaling approximately $17,050.00 written on or around January 30, 2024, and May 6, 2024, from CCMKE's Associated

Bank account to PORTER. I also reviewed with NB the bills associated with these checks that were entered to the CCMKE QuickBooks for PORTER. Each bill contained the memo, "Server Transition." NB stated that CCMKE's legitimate IT vendor performed a server transition during May 2024, but that this was not performed by PORTER. CCMKE's legitimate IT vendor was issued a legitimate $15,000.00 check from CCMKE for the server transition hardware on May 3, 2024. Bank records received indicate that fraudulent CCMKE check #206682 was written on or around January 30, 2024, and was deposited to **SUBJECT ACCOUNT 17** held at Landmark Credit Union in the name of PORTER, and fraudulent CCMKE check #206980 was written on or around May 6, 2024, and deposited to **SUBJECT ACCOUNT 18** held at Landmark Credit Union in the name of PORTER**.**

37.     Based on my review of **SUBJECT ACCOUNT 17**, PORTER opened this account on or around September 10, 2018, and on the same day, deposited fraudulent CCMKE check #200124 written from CCMKE to PORTER for approximately $8,550.00. I was unable to locate any record of this check existing in the CCMKE QuickBooks. Based on my training and experience, this is an indicative attempt to conceal a fraudulent check issued to a fraudulent vendor.

38.     Based on my review of **SUBJECT ACCOUNT 18** and the deposit of fraudulent CCMKE check #206980 on or around May 6, 2024, for approximately $9,800.00, the deposit of this check was the only deposit that PORTER made during 2024 to this account. Further, following this deposit and during that same month, PORTER completed nine cash withdrawals, including multiple even dollar withdrawals, totaling approximately $8,132.98 and left a remaining balance of approximately $1,618.06 in the account.

39.     Based on my training and experience, it appears that the primary purpose of **SUBJECT ACCOUNT 18** held at Landmark Credit Union in the name of PORTER was to receive

fraudulent proceeds from this scheme and convert them to cash to conceal or disguise the nature, the location, the source, the ownership, or the control of the proceeds.

40. Before the use of the above held accounts by PORTER at Landmark Credit Union, PORTER normally deposited CCMKE checks to **SUBJECT ACCOUNT 19** held at Educators Credit Union in his name. Based on my review of the CCMKE QuickBooks and bank records obtained during this investigation, between October 2017 and November 2019, PORTER deposited approximately 14 CCMKE checks totaling approximately $42,801.09 to **SUBJECT ACCOUNT 19**. Approximately eight of these checks totaling approximately $17,790.51 were entered to the CCMKE QuickBooks as paid to vendors other than PORTER. Based on my training and experience, this is an indicative attempt to conceal a fraudulent check issued to a fraudulent vendor, thereby concealing the nature, source, location, ownership, and control of the proceeds.

41. In addition to receiving fraudulent CCMKE checks, it appears the primary sources of deposit to **SUBJECT ACCOUNT 19** was direct deposits received from AT&T, as well as transfers from other **SUBJECT ACCOUNTS** held in the name of JOHNSON. Based on my training and experience, money launderers will commingle illicit proceeds with legitimate income to create the appearance of legitimacy and conceal the true source of the funds.

## IX. Fraudulent CCMKE Checks Written to M.I.H. CREATIONS and MOORE and Deposited to SUBJECT ACCOUNT 14 and SUBJECT ACCOUNT 15 held at Educators Credit Union in the name of MOORE and M.I.H. CREATIONS

42. Based on my interview with NB, M.I.H. CREATIONS is a completely unknown vendor to CCMKE. Supporting docs were located with check requests that made it look like this vendor was tied to spring events CCMKE hosted. A review of an M.I.H. CREATIONS Facebook page revealed an image of former CCMKE employee, MOORE. ELLIS' and MOORE's CCMKE

email records show communications with an M.I.H. CREATIONS google email address. Communications also show that MOORE scanned an M.I.H. CREATIONS invoice to send it from her CCMKE email to an M.I.H CREATIONS email address and to ELLIS' email address.

43. According to NB, CCMKE ran a full history of checks issued to MOORE and identified that some checks were issued to her for legitimate payroll. This occurred due to HR making a mistake in calculating payroll.

44. CCMKE also located a check stub associated with a $3,000.00 payment for tuition reimbursement indicated as paid to MOORE. NB stated CCMKE doesn't provide tuition reimbursement, and that RC had never seen or approved a $3,000.00 check associated with this stub. I reviewed with NB, CCMKE check #206937 associated with the check stub that CCMKE located dated April 16, 2024, in the amount of $3,000.00 made payable to MOORE, as well as the bill associated with this check entered to the CCMKE QuickBooks containing the memo, "Class online." NB stated that online classes aren't something CC would pay for. This check was deposited to **SUBJECT ACCOUNT 14** held at Educators Credit Union in the name of MOORE.

45. I reviewed with NB, checks #206242, #206771, #206826, and #206853 (totaling approximately $33,684.40) paid in 2023 and 2024 from CCMKE's Associated Bank account. I also reviewed with NB, the bills associated with these checks that were entered in CCMKE's QuickBooks as paid to MOORE and M.I.H. CREATIONS. Each bill included a memo referencing a legitimate event hosted by CCMKE, but handled by a different legitimate vendor who was separately paid for the event. According to CCMKE, the checks made payable to M.I.H. CREATIONS for these events were fraudulent and unauthorized. Each of these fraudulent checks were deposited to **SUBJECT ACCOUNT 15** held at Educators Credit Union in the name of M.I.H. CREATIONS. In fact, CCMKE check deposits appear to be the primary source of funding

and purpose of **SUBJECT ACCOUNT 15**. Between May 2022 and May 2024, approximately $130,000.00 was received by MOORE in the form of CCMKE check deposits. The second largest source being from Cash App, totaling approximately $7,000.00

46.     Based on my review of **SUBJECT ACCOUNT 15**, following the deposit of a CCMKE check by MOORE, MOORE frequently completed a cash withdrawal in the amount of approximately 50% of the deposit. Further, MOORE frequently completed withdrawals on the same day or the day after she deposited a CCMKE check. I observed this pattern of activity occurring between October 2022 and April 2024 following the deposit of approximately 14 CCMKE checks deposited to **SUBJECT ACCOUNT 15** for a total deposit amount of approximately $76,121.03, and a total withdrawal amount of approximately $39,059.00 (or approximately 51%). A sample of this activity is as follows:

| Cash Withdrawals occurring with a CCMKE Check Deposit to **SUBJECT ACCOUNT 15** \| October 19, 2022 through April 30, 2024 | | | | | | | |
|---|---|---|---|---|---|---|---|
| **Transaction Description** | **Date** | **CCMKE Check #** | **Check Payor** | **Check Payee** | **Deposit Amount** | **Withdrawal Amount** | **% of Deposit** |
| Check Deposit | 11/22/2023 | 206505 | Catholic Charities of Milwaukee | M.I.H Creations | $4,400.00 | | |
| Cash Withdrawal | 11/22/2023 | | | | | $2,200.00 | 50.00% |
| Check Deposit | 02/21/2024 | 206771 | Catholic Charities of Milwaukee | M.I.H Creations | $7,130.00 | | |
| Cash Withdrawal | 02/21/2024 | | | | | $3,565.00 | 50.00% |
| Check Deposit | 03/12/2024 | 206826 | Catholic Charities of Milwaukee | M.I.H Creations | $11,997.00 | | |
| Cash Withdrawal | 03/12/2024 | | | | | $5,998.00 | 50.00% |
| | | | | **TOTAL** | **$23,527.00** | **$11,763.00** | 50% |

47. Based on my training and experience, I am aware that individuals involved in schemes to defraud will frequently split the illicit proceeds of their schemes. I am further aware that these splits are typically either a fixed amount or a percentage of the illicit proceeds. Based on the timing of the deposit and withdrawal, I believe that MOORE split a portion of the check with ELLIS.

48. Based on my training and experience, depositing fraud proceeds in a bank account and immediately withdrawing the funds as cash, is strong evidence of an intent to conceal the location of the funds for the simple reason that cash cannot be traced.

## X. Fraudulent CCMKE Checks Written to JOHNSON and Deposited to SUBJECT ACCOUNT 13 and SUBJECT ACCOUNT 20 held at Educators Credit Union and Wells Fargo in the name of JOHNSON, and the Movement of Illicit Proceeds to SUBJECT ACCOUNT 26 held at Educators Credit Union

49. Based on my interview with NB, JOHNSON was a legitimate CCMKE vendor from October 2022 to May 2024. It was expected and verbally agreed upon between CCMKE and JOHNSON that JOHNSON would earn $50,000.00 per year from CCMKE. JOHNSON was expected to receive some checks from CCMKE since she was a legitimate vendor and not in the payroll system. However, JOHNSON was not expected to perform services on a continuous basis and should only have received payments from CCMKE between January and mid-May when JOHNSON assisted CCMKE with audits completed by Baker Tilly.

50. Based on my review of Associated Bank records, approximately 83 checks totaling approximately $267,138.43 were made payable to JOHNSON between May 23, 2018 and May 14, 2024 from CCMKE. In 2023, approximately 45 checks totaling approximately $146,362.03 were made payable to JOHNSON – nearly tripling what JOHNSON was expected to legitimately earn

from CCMKE in a year. Additionally, approximately 22 checks totaling approximately $81,562.53 were made payable to JOHNSON between June 2023 and December 2023. Not only does this exceed the $50,000.00 that JOHNSON would be expected to receive in a year, but these checks were issued outside of the months JOHNSON performed services for CCMKE. Approximately nine of these 2023 CCMKE checks were deposited to **SUBJECT ACCOUNT 13** in the name of JOHNSON, and approximately ten were deposited to **SUBJECT ACCOUNT 20** in the name of JOHNSON. Further, JOHNSON often transferred funds between these accounts with no discernable purpose. Based on my training and experience, the transferring of proceeds is indicative of concealment as offenders will often transfer proceeds between accounts to make it harder to link the funds to illegal activity.

51. The largest source of deposits to **SUBJECT ACCOUNT 13**, not including transfers from other bank accounts held in the name of JOHNSON, between 2019 and May 2024 are as follows:

    a. Approximately $168,000.00 in transfers from **SUBJECT ACCOUNT 19** held at Educators Credit Union in the name of PORTER;

    b. Approximately $91,000.00 in checks written from CCMKE to JOHNSON; and

    c. Approximately $80,000.00 in direct deposits from CCMKE.

52. During this same time frame, JOHNSON completed approximately $70,000.00 in ATM and cash withdrawals from **SUBJECT ACCOUNT 13**, often in even dollar amounts.

53. Shortly following the deposit of a CCMKE check to **SUBJECT ACCOUNT 13**, JOHNSON frequently completed transfers to **SUBJECT ACCOUNT 26** held jointly in the name of JOHSON and PORTER at Educators Credit Union. Between November 2022 and April 2024, JOHNSON deposited approximately 24 CCMKE checks totaling approximately $63,000.00 to

**SUBJECT ACCOUNT 13** followed by (sometimes on the same or next day) approximately 31 transfers totaling approximately $46,000.00 to **SUBJECT ACCOUNT 26**. Further, no apparent legitimate source of income from business activity appears to be deposited to **SUBJECT ACCOUNT 26** and is primarily funded by transfers from other **SUBJECT ACCOUNTS** held in the name of JOHNSON and PORTER. I believe that this pattern of transfers with no identifiable income demonstrates intent to conceal or disguise illicit proceeds.

54.     The largest source of deposits to **SUBJECT ACCOUNT 20** between February 2016 and October 2024 is checks written from CCMKE to JOHNSON totaling approximately $118,000.00 (or approximately 55% of total deposits during this same time frame). Further, approximately $21,000.00 in Zelle payments were made to ELLIS, and approximately $22,000.00 in ATM and cash withdrawals were completed from **SUBJECT ACCOUNT 20**.

55.     Based on this information, I believe that **SUBJECT ACCOUNT 13**, **SUBJECT ACCOUNT 20**, and **SUBJECT ACCOUNT 26** existed with purposes of receiving fraudulent checks, converting illicit proceeds into currency, sharing illicit proceeds with ELLIS, and moving illicit proceeds between other **SUBJECT ACCOUNTS** to conceal and disguise the nature, source, location, and control of the funds. Therefore, I believe that the accounts are subject to seizure to the United States.

**XI.     Fraudulent CCMKE Checks Written to JOHNSON and Deposited to SUBJECT ACCOUNT 6 and SUBJECT ACCOUNT 25 held at Associated Bank and Discover Bank in the name of ELLIS**

56.     Based on my review of Associated Bank and CCMKE QuickBooks records, the following checks were made payable from CCMKE to JOHNSON but were deposited to **SUBJECT ACCOUNT 6** and **SUBJECT ACCOUNT 25** in the name of ELLIS. The back of

each check contained two endorsements that I believe to be those of ELLIS and JOHNSON, and were deposited as follows:

    a. Check #204838 written for $2,400.00 on or around 10/6/2022 and deposited to **SUBJECT ACCOUNT 25** on the same day;

    b. Check #204901 written for $3,275.00 on or around 10/26/2022 and deposited to **SUBJECT ACCOUNT 6** on or around 10/31/2022 in addition to $500.00 cash. The associated deposit slip is endorsed by ELLIS;

    c. Check #204982 written for $4,000.00 on or around 12/01/2022 and deposited to **SUBJECT ACCOUNT 6** on or around 12/02/2022. The associated deposit slip is endorsed by ELLIS; and

    d. Check #205603 written for $4,837.50 on 01/05/2023 and deposited to **SUBJECT ACCOUNT 6** on the same day. The associated deposit slip is endorsed by ELLIS.

57. Based on my review of the CCMKE QuickBooks, approximately 60 checks made payable to JOHNSON were entered to billing account "60100 – Salaries and Wages." Based on my interview with NB, these checks were entered this way to conceal the fraud and nature of the funds. Approximately 40 checks made payable to JOHNSON between 2023 and 2024 were entered or last modified by user, Msimonis, who was no longer employed by CCMKE during these years. Approximately 58 bills contain the memo, "Consultant," – approximately 34 of which were written between June and December when JOHNSON wouldn't be expected to receive a check. Based on my training and experience, there is probable cause to believe that the use of "Consultant" is an effort to conceal the nature of the fraudulently obtained funds.

**XII. Movement of Illicit Proceeds to SUBJECT ACCOUNTS 2, 7, 8, and 9 held at Associated Bank in the name of ELLIS**

58. On or around September 13, 2023, ELLIS opened **SUBJECT ACCOUNT 7** in the name of ELLIS EMPIRE LLC held at Associated Bank. On that same day, ELLIS deposited approximately $2,800.00 cash to this account. In summary, between the date of account opening and February 2024, ELLIS completed the following cash transactions and transfers to and from other **SUBJECT ACCOUNTS** also in ELLIS' control at Associated Bank from **SUJECT ACCOUNT 7**:

| Deposits and Withdrawals to/from **SUBJECT ACCOUNT 7** \| September 13, 2023 through February 2024 | | | | |
|---|---|---|---|---|
| **Description of Activity** | **# of Deposits** | **Sum of Deposits** | **# of Withdrawals** | **Sum of Withdrawals** |
| Cash Deposit | 27 | $ 77,972.92 | | |
| Transfer(s) from **SUBJECT ACCOUNT 6** | 2 | $ 8,000.00 | | |
| Transfer(s) to **SUBJECT ACCOUNT 6** | | | 2 | $ 2,155.00 |
| Transfer(s) to **SUBJECT ACCOUNT 8** | | | 1 | $ 50,000.00 |
| Cash Withdrawal | | | 1 | $ 500.00 |
| **Grand Total** | **23** | **$ 66,422.92** | **4** | **$ 52,655.00** |

59. On or around January 8, 2024, ELLIS opened **SUBJECT ACCOUNT 8**. This account was also opened and is held at Associated Bank in the name of ELLIS EMPIRE LLC. Following the above highlighted $50,000.00 transfer that occurred during January 2024 from **SUBJECT ACCOUNT 7** to **SUJECT ACCOUNT 8**, ELLIS withdrew $25,000.00 from **SUBJECT ACCOUNT 8** to open **SUBJECT ACCOUNT 2**, a certificate of deposit account in her name, on or around March 19, 2024 at Associated Bank.

60. Based on my interview with NB, when CCMKE went through ELLIS' office at CCMKE, paperwork was found associated with ELLIS EMPIRE LLC. This paperwork included a service contract between ELLIS EMPIRE LLC and another charity under the Archdiocese of Milwaukee (herein referred to as "Charity 2"). Based on my interview with the director of Charity 2 (herein referred to as "AM"), AM contracted the work of ELLIS to assist in maintaining the

books and records of Charity 2 until they could hire a fulltime accountant. ELLIS submitted a bid to Charity 2 for the work to completed by her company, ELLIS EMPIRE LLC. Further, in my review of the Domestic Limited Liability Company Annual Report filed on or about July 7, 2024, with the Wisconsin Department of Financial Institutions, ELLIS is the listed signer and sole member of ELLIS EMPIRE LLC.

61.     Based on my training and experience, I am aware that individuals involved in schemes to defraud will frequently use accounts held by business entities to conceal the illicit nature of funds by making them appear legitimate business activity.

62.     On or around December 10, 2012, ELLIS became power of attorney on **SUBJECT ACCOUNT 9** held at Associated Bank in the name of her sister, Kionna Ellis. Based on my analysis of **SUBJECT ACCOUNT 9**, this account made approximately 54 ATM deposits in even dollar amounts totaling approximately $22,165.00 between 2019 and 2024. Also during this timeframe, **SUBJECT ACCOUNT 9** completed hundreds of unexplained transfers totaling approximately $200,000.00 to and from other **SUBJECT ACCOUNTS** held in the name of ELLIS and ELLIS EMPIRE LLC at Associated Bank as well as hundreds of transfers to various **SUBJECT ACCOUNTS** held solely in the name of ELLIS at Betterment.

63.     Based on my training and experience, I am aware that individuals involved in schemes to defraud and money laundering will frequently utilize LLCs and other business entities to receive the proceeds of their fraudulent schemes. Individuals do so to conceal fraudulent proceeds as legitimate business receipts in a manner that conceals the source, nature, and/or ownership of the funds. Furthermore, I am aware that individuals involved in schemes to defraud and money laundering will frequently transfer funds between bank accounts held by LLCs and/or

businesses and personal accounts. This is done to conceal the source of the funds and allow the perpetrators of the scheme to spend their illicit proceeds.

**XIII. Movement of Illicit Proceeds from SUBJECT ACCOUNTS 6, 9, and 19 held at Associated Bank in the name of ELLIS to SUBJECT ACCOUNTS 10, 11, and 12 held at Betterment in the name of ELLIS**

64.     As previously outlined in this affidavit, during October of 2022, December of 2022, and January of 2023, ELLIS deposited at least three CCMKE checks made payable to JOHNSON to **SUBJECT ACCOUNT 6** in the name of ELLIS for an aggregate total of approximately $12,112.50. Additionally, between June 2019 and on or around February 22, 2024, ELLIS completed approximately 18 cash deposits totaling approximately $33,470.00 to **SUBJECT ACCOUNT 6** held in her name at Associated Bank. During each month that ELLIS deposited a CCMKE check made payable to JOHNSON, and between June of 2021 and May of 2024, ELLIS completed approximately 76 transfers from **SUBJECT ACCOUNT 6** to **SUBJECT ACCOUNT 10** held at Betterment in her name totaling approximately $15,200.00.

65.     As previously mentioned in this affidavit, hundreds of transfers were completed from **SUBJECT ACCOUNT 9** held at Associated Bank to various **SUBJECT ACCOUNTS** held at Betterment in the name of ELLIS. A summary of these transfers occurring between June of 2021 and May of 2024 is as follows:

a.  Approximately 74 withdrawals from **SUBJECT ACCOUNT 9** to **SUBJECT ACCOUNT 10** totaling approximately $8,725.00;

b.  Approximately 61 withdrawals from **SUBJECT ACCOUNT 9** to **SUBJECT ACCOUNT 11** totaling approximately $6,100.00; and

c. Approximately one withdrawal from **SUBJECT ACCOUNT 9** to **SUBJECT ACCOUNT 12** totaling approximately $150.00.

66. On or around October 6, 2022, ELLIS deposited CCMKE check #204838 made payable to fraud vendor, JOHNSON, in the amount of approximately $2,400.00 to **SUBJECT ACCOUNT 25** held at Discover Bank in the name of ELLIS. This check made payable to JOHNSON contained the memo, "Consultant", within QuickBooks. Following this deposit and through the end of the next month, November of 2022, ELLIS received multiple Zelle deposits from JOHNSON to **SUBJECT ACCOUNT 25** totaling approximately $4,320.00 and sent one Zelle payment to JOHNSON totaling approximately $1,200.00. Additionally, ELLIS deposited two cashier's checks (#2007097200 and #2007105368) totaling approximately $8,800.00 to **SUBJECT ACCOUNT 25** that she purchased and made payable to herself from **SUBJECT ACCOUNT 6** held at Associated Bank in her name. After the above transactions were completed, on or around November 28, 2022, ELLIS transferred approximately $15,000.00 from **SUBJECT ACCOUNT 25** held at Discover Bank to **SUJECT ACCOUNT 10** held at Betterment also in her name.

67. Based on my training and experience and records reviewed in this investigation, I believe **SUBJECT ACCOUNT 6** and **SUBJECT ACCOUNT 9**, and **SUBJECT ACCOUNT 25** were used to receive and move illicit proceeds between each other. I further believe **SUBJECT ACCOUNT 6** and **SUBJECT ACCOUNT 9**, and **SUBJECT ACCOUNT 25** were used to facilitate the funding of **SUBJECT ACCOUNT 10**, **SUBJECT ACCOUNT 11**, and **SUBJECT ACCOUNT 12**.

XIV. **Movement of Illicit Proceeds to SUBJECT ACCOUNTS 21, 22, 23, and 24 held at Ally Bank in the name of ELLIS**

68. On the following dates, ELLIS opened the following accounts in her name at Ally Bank:

   a. **SUBJECT ACCOUNTS 22 and 23** on or around December 26, 2022;

   b. **SUBJECT ACCOUNT 21** on or around January 27, 2023; and

   c. **SUBJECT ACCOUNT 24** on or around April 14, 2023.

69. Following the time of account opening for each of these accounts and through August 18, 2024, ELLIS purchased approximately 16 cashier's checks from Associated Bank and made them payable to herself. Approximately 15 of these cashier's checks were purchased with cash, and all 16 were deposited amongst **SUBJECT ACCOUNT 21, SUBJECT ACCOUNT 23, and SUBJECT ACCOUNT 24,** in her name, at Ally Bank. A summary of this activity is as follows:

| Associated Bank Cashier's Check Deposits to Ally Bank Accounts in the name of ELLIS | | | | | | |
|---|---|---|---|---|---|---|
| Date | Associated Bank Cashier's Check # | Remitter | Payee | Deposited to SUBJECT ACCOUNT 21 | Deposited to SUBJECT ACCOUNT 23 | Deposited to SUBJECT ACCOUNT 24 |
| 03/02/2023 | 2007149995 | ELLIS | ELLIS | | $600.00 | |
| 03/29/2023 | 2007158811 | ELLIS | ELLIS | | $1,300.00 | |
| 04/03/2023 | 2007161565 | ELLIS | ELLIS | | $1,550.00 | |
| 04/06/2023 | 2007164541 | ELLIS | ELLIS | | $1,500.00 | |
| 04/14/2023 | 2007167936 | ELLIS | ELLIS | | $980.00 | |
| 05/12/2023 | 2007179830 | ELLIS | ELLIS | | | $980.00 |
| 05/12/2023 | 2007179825 | ELLIS | ELLIS | | $500.00 | |
| 05/25/2023 | 2007185697 | ELLIS | ELLIS | | $600.00 | |
| 05/25/2023 | 2007185701 | ELLIS | ELLIS | $400.00 | | |
| 07/28/2023 | 2007211161 | ELLIS | ELLIS | | $10,000.00 | |
| 08/18/2023 | 2007220327 | ELLIS | ELLIS | | $2,860.00 | |
| 08/24/2023 | 2007222844 | ELLIS | ELLIS | $5,000.00 | | |
| 09/01/2023 | 2007227664 | ELLIS | ELLIS | | | $500.00 |
| 09/01/2023 | 2007227666 | ELLIS | ELLIS | $3,000.00 | | |
| 09/01/2023 | 2007227665 | ELLIS | ELLIS | | $2,500.00 | |
| 09/21/2023 | 2007235689 | ELLIS | ELLIS | | $900.00 | |
| | | | Total | $8,400.00 | $23,290.00 | $1,480.00 |

| Grand Total | $33,170.00 |
|---|---|

70.     Based on my training and experience, offenders will often convert cash and illicit proceeds into monetary instruments such as cashier's checks in attempts to disguise the true nature of the transaction and make the illicit proceeds appear as legitimate.

71.     Based on my review of **SUBJECT ACCOUNT 21**, **SUBJECT ACCONT 22**, **SUBJECT ACCOUNT 23**, and **SUBJECT ACCOUNT 24** held at Ally Bank in the name of ELLIS, these accounts received very few deposits from sources other than the schemes described in this affidavit. Not including transfers directly between these accounts, interest payments, or the above-mentioned cashier's checks, ELLIS completed approximately 52 deposits totaling approximately $73,554.84 to these Ally Bank accounts. None of the deposits showed any activity consistent with legitimate income or employment related income. Specifically, other deposits these accounts received consisted of approximately 13 Zelle payments to herself totaling approximately $7,500.00, approximately two Zelle payments from RAMON totaling approximately $409.00, and Associated Bank cashier's check #2007268010 that ELLIS purchased and made payable to herself totaling approximately $4,764.00 which was funded by a cash deposit of approximately $1,950.00 and CCMKE check #206538 paid to her totaling approximately $2,814.00.

## XV.     Movement of Illicit Proceeds between SUBJECT ACCOUNTS 21, 22, 23, and 24 held at Ally Bank in the name of ELLIS

72.     As discussed above, ELLIS utilized the following Ally Bank accounts in her name to move illicit proceeds directly between each other:

73.     Between January 27, 2023 and August 18, 2024, **SUBJECT ACCOUNT 21** completed numerous transfers totaling approximately $44,994.75. Of these transfers, more than half consisted of transfers from **SUBJECT ACCOUNT 21** to other Ally Bank accounts controlled

by ELLIS. Specifically, during the period, the transfers from **SUBJECT ACCOUNT 21** consisted of:

    a. Approximately 11 transfers to **SUBJECT ACCOUNT 22** totaling approximately $36,775.75;

    b. Approximately one transfer to **SUBJECT ACCOUNT 23** totaling approximately $219.00; and

    c. Approximately one transfer to **SUBJECT ACCOUNT 24** totaling approximately $1,000.00.

74. Between December 26, 2022 and August 18, 2024, **SUBJECT ACCOUNT 22** completed numerous transfers totaling approximately $7,733.61 to other Ally Bank accounts controlled by ELLIS. Specifically, during the period, the transfers from **SUBJECT ACCOUNT 22** consisted of:

    a. Approximately two transfers to **SUBJECT ACCOUNT 21** totaling approximately $2,299.00;

    b. Approximately five transfers to **SUBJECT ACCOUNT 23** totaling approximately $5,300.00; and

    c. Approximately one transfer to **SUBJECT ACCOUNT 24** totaling approximately $100.00.

75. Between December 26, 2022 and August 18, 2024, **SUBJECT ACCOUNT 23** completed numerous transfers totaling approximately $83,618.06. Of these transfers, more than half consisted of transfers from **SUBJECT ACCOUNT 23** to other Ally Bank accounts controlled by ELLIS. Specifically, during the period, the transfers from **SUBJECT ACCOUNT 23** consisted of:

a. Approximately two transfers to **SUBJECT ACCOUNT 21** totaling approximately $29,752.00;

b. Approximately four transfers to **SUBJECT ACCOUNT 22** totaling approximately $15,000.00; and

c. Approximately six transfers to **SUBJECT ACCOUNT 24** totaling approximately $11,488.00.

76. Between April 14, 2023 and August 18, 2024, **SUBJECT ACCOUNT 24** completed numerous transfers totaling approximately $14,101.54. Of these transfers, more than half consisted of transfers from **SUBJECT ACCOUNT 24** to other Ally Bank accounts controlled by ELLIS. Specifically, during the period, the transfers from **SUBJECT ACCOUNT 24** consisted of:

a. Approximately seven transfers to **SUBJECT ACCOUNT 22** totaling approximately $11,600.00; and

b. Approximately one transfer to **SUBJECT ACCOUNT 23** totaling approximately $2,000.00.

77. The circular series of transfers between bank accounts controlled by ELLIS is indicative of an attempt to conceal the origin of funds and complicate efforts by law enforcement to trace the funds to their ultimate destination. Although the proceeds of bank fraud may have been comingled with otherwise legitimately obtained funds during these transfers, the accounts contain funds involved in or traceable to money laundering offenses, thereby rendering all funds subject to forfeiture.

**XVI. Movement of Illicit Proceeds from SUBJECT ACCOUNT 22 held at Ally Bank in the name of ELLIS to SUBJECT ACCOUNT 1 and SUBJECT ACCOUNT 3 held at Associated Bank in the name of ELLIS**

78. Based on my training and experience and records reviewed in this investigation, I believe that **SUBJECT ACCOUNT 22** held at Ally Bank in ELLIS' name was used to receive and move illicit proceeds between other Ally Bank accounts held in ELLIS' name. I further believe that **SUBJECT ACCOUNT 22** was used to open and fund multiple certificate of deposit accounts as discussed in further detail below.

79. On March 24, 2023, Associated Bank stamped the reverse of check #1021 that ELLIS wrote to herself from **SUBJECT ACCOUNT 22** held at Ally Bank in her name totaling approximately $10,000.00. This check contained the memo, "7 month CD." On that same day, ELLIS opened **SUBJECT ACCOUNT 1**, a certificate of deposit account held at Associated Bank in her name with an initial deposit of approximately $10,000.00.

80. In a similar fashion, on or around November 28, 2023, Associated Bank stamped the reverse of check #1025 that ELLIS wrote to herself from **SUBJECT ACCOUNT 22** held at Ally Bank in her name totaling approximately $10,000.00. On that same day, ELLIS opened **SUBJECT ACCOUNT 3**, a certificate of deposit account held at Associated Bank in her name with an initial deposit of approximately $10,000.00.

**XVII. Movement of Illicit Proceeds to SUBJECT ACCOUNT 4 and SUBJECT ACCOUNT 5 held at Associated Bank in the name of ELLIS**

81. On or around July 27, 2023, ELLIS purchased cashier's check #2007211137 totaling approximately $16,900.00 made payable to herself from **SUBJECT ACCOUNT 9** held at Associated Bank and controlled by ELLIS and her sister. The back of this cashier's check was

stamped on the same day by Associated Bank. Approximately 30 minutes later, ELLIS disposed of approximately $16,900.00 for the purchase of another cashier's check (check #2007211161) made payable to herself from Associated Bank totaling approximately $10,000.00 and opened **SUBJECT ACCOUNT 4**, a certificate of deposit account held at Associated Bank in her name, with an initial deposit of approximately $6,900.00. On the next day, ELLIS deposited check #2007211161 to **SUBJECT ACCOUNT 23** held at Ally Bank in ELLIS' name.

82.     On or around October 16, 2023, ELLIS opened **SUBJECT ACCOUNT 5**, a certificate of deposit account held at Associated Bank in her name with an initial cash deposit of approximately $7,000.00.

83.     Based on my training and experience and reviewed in this investigation, I believe that, like the other certificate of deposit accounts held at Associated Bank in ELLIS' name, ELLIS opened **SUBJECT ACCOUNT 4** and **SUBJECT ACCOUNT 5** at Associated Bank with proceeds obtained from the fraud scheme set forth in this affidavit and are subject to seizure to the United States.

## CONCLUSION

84.     Based on information derived from the foregoing investigation, there is probable cause to conclude that the **SUBJECT ACCOUNTS** contain property constituting, or traceable to, the proceeds of a specified unlawful activity, to wit, the bank fraud activity conducted in association with the above-described scheme. There is further probable cause to believe that these funds are property involved in money laundering as they were transferred through several accounts with no discernable purpose other than concealing the source or nature of the stolen funds. Accordingly, I respectfully request that this Court issue a warrant authorizing the seizure of the funds in the **SUBJECT ACCOUNTS**.

85.     I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge.